IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:14CV91

| | |
|---|---|
| KENNETH D. BELL, in his capacity as a court-appointed Receiver for Rex Venture Group, LLC d/b/a ZeekRewards.com, <br><br> Plaintiff, <br><br> v. <br><br> TODD DISNER, in his individual capacity and in his Capacity as trustee for Kestrel Spendthrift Trust; TRUDY GILMOND; TRUDY GILMOND, LLC; JERRY NAPIER; DARREN MILLER; RHONDA GATES; DAVID SORRELLS; INNOVATION MARKETING, LLC; AARON ANDREWS; SHARA ANDREWS; GLOBAL INTERNET FORMULA, INC; T. LEMONT SILVER; KAREN SILVER; MICHAEL VAN LEEUWEN; DURANT BROCKETT; DAVID KETTNER; MARY KETTNER; P.A.W.S. CAPITAL MANAGEMENT LLC; LORI JEAN WEBBER; and a Defendant Class of Net Winners in ZEEKREWARDS.COM, <br><br> Defendants. | ORDER |

This matter is before the Court upon Named Defendants Trudy Gilmond, Trudy Gilmond, LLC, Jerry Napier, Darren Miller, Durant Brockett, Rhonda Gates, Innovation Marketing LLC, Aaron Andrews, Shara Andrews, Global Internet Formula, Inc., T. Lemont Silver, and Karen Silver's Motions to Dismiss this action pursuant to Rules 9, 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure (Doc. Nos. 21, 23, 24, 29 and 36). The Receiver has filed a Consolidated Response in Opposition to Defendants' Motions to Dismiss (Doc. No. 67), and certain Defendants have filed a Reply (Doc. No. 75). This matter is now ripe for consideration by the Court.

1

## FACTUAL BACKGROUND

This "clawback" litigation was initiated by the Receiver of Rex Venture Group, LLC ("RVG"). The Complaint alleges as follows: Paul Burks, the owner and former top executive of RVG, and other management insiders used RVG in their operation of a massive Ponzi and pyramid scheme through ZeekRewards ("Zeek") from at least January 2011 until August 2012. Compl. at ¶¶ 1, 6–9. Over 700,000 participants lost over $700 million dollars in the scheme. *Id.* at ¶ 1. Burks and the management insiders used ZeekRewards to promise substantial payouts and outsize returns to all participants, but few actually benefitted. *Id.* at ¶ 2. Those who did benefit were paid not with profits from a legitimate retail operation, but rather from money paid in by later investors in the scheme. *Id.* at ¶ 3. The largest "net winners" (those who received more money from Zeek than they paid in to Zeek) each received well over a million dollars, and many others received hundreds of thousands of dollars. *Id*. at ¶¶ 2, 12–25.

On August 17, 2012, the Securities and Exchange Commission filed an action in this Court, *Securities and Exchange Commission v. Rex Venture Group, LLC d/b/a ZeekRewards.com and Paul Burks*, Civil Action No. 3:12-cv-519 (the "SEC Action"), to obtain injunctive and monetary relief against Paul Burks, shut down the ZeekRewards Ponzi and pyramid scheme, freeze RVG's assets, and seek appointment of a Receiver for RVG. Compl. at ¶ 26. Also on August 17, RVG, through Burks, admitted to this Court's jurisdiction over RVG and the subject matter of the SEC action, and it consented to entry of judgment in favor of the SEC. SEC Action, Doc. No. 5 at ¶¶ 1–2. As a result, the Court entered consent judgments against RVG and Burks enjoining them from violating the

federal securities statutes or participating in, or facilitating, the solicitation of any investment in any security or in the offering of a security. SEC Action, Doc. Nos. 6, 8.

That same date, in an Agreed Order Appointing Temporary Receiver and Freezing Assets of Defendant Rex Venture Group, LLC (the "Agreed Order"), this Court appointed Kenneth D. Bell as the Receiver over the assets, rights, and all other interests of the estate of Rex Venture Group, LLC, d/b/a www.ZeekRewards.com and its subsidiaries and any businesses or business names under which it does business (the "Receivership Entities"). Compl. at ¶ 27. The Order further directed Mr. Bell as RVG's Receiver to institute actions and legal proceedings seeking the avoidance of fraudulent transfers, disgorgement of profits, imposition of constructive trusts and any other legal and equitable relief that the Receiver deems necessary and appropriate to preserve and recover RVG's assets for the benefit of the Receivership Estate. *Id*.

Like all classic Ponzi and pyramid schemes, the vast majority of the Zeek winners' money came from the Zeek losers rather than legitimate business profits. At least $845 million was paid in to Zeek. *Id.* at ¶ 3. No more than $6.3 million (less than 1%) came from retail bid purchases by non-participants. *Id*. In total, the Zeek database records show that over 92% of the money paid in to Zeek came from net losers rather than net winners, and Zeek's net winners received over $283 million in net winnings. *Id.*

Because Zeek's net winners "won" the victims' money in an unlawful combined Ponzi and pyramid scheme, the net winners are not permitted to keep their winnings and must return the fraudulently transferred winnings to the Receiver for distribution to Zeek's victims. *Id.* at ¶ 4. Accordingly, the Plaintiff Receiver filed this "clawback" action on February 28, 2014, asserting claims of relief against Defendants for: (1)

Fraudulent Transfer of RVG Funds in Violation of the North Carolina Uniform Fraudulent Transfer Act; (2) Common Law Fraudulent Transfer; and (3) Constructive Trust. Defendants have moved to dismiss the Complaint pursuant to Rules 12(b)(1), 12(b)(6) and 9 of the Federal Rules of Civil Procedure.

## DISCUSSION

**A. Subject Matter Jurisdiction**

Defendants argue that this case must be dismissed for lack of subject matter jurisdiction pursuant to Rule 12(b)(1).[1] The SEC Action, from which the Receiver derives his authority to file the instant lawsuit, is based upon violations by RVG of federal securities statutes. The Defendants contend that there is no subject matter jurisdiction in this case because RVG was not involved in the sale or marketing of any "securities."

Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act define a "security" to include an "investment contract." The Supreme Court has defined an "investment contract" as: (1) the investment of money; (2) in a common enterprise; (3) with an expectation of profits to be derived solely from the efforts of the promoter or a third party. *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946). The *Howey* test is a "flexible" principle "capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *SEC v. Edwards*, 540 U.S. 389, 393 (2004). The Supreme Court has explained that Congress intended the application of the Securities Act and Exchange Act "to turn on the economic

---

[1] From the outset, the Court notes that it is of no consequence that RVG and Burks admitted the Court's subject matter jurisdiction in the consent judgment entered in the SEC Action. It is clear that subject matter jurisdiction cannot be conferred by the parties. *Brickwood Contractors, Inc. v. Datanet Eng'g, Inc.*, 369 F.3d 385, 390 (4thCir. 2004).

realities underlying a transaction, and not on the name appended thereto." *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 849 (1975).

Courts have applied the *Howey* test to define a wide range of Ponzi schemes, pyramid schemes, and multi-level marketing schemes— including internet-based schemes— as securities. *See, e.g., SEC v. SG Ltd.*, 265 F.3d 42 (1st Cir. 2001) (internet-based Ponzi scheme); *SEC v. Int'l Loan Network, Inc.*, 968 F.2d 1304, 1307-08 (D.C. Cir. 1992) (pyramid scheme); *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 478-79 (5th Cir. 1974) (multi-level marketing scheme); *SEC v. Glenn W. Turner Enters.*, 474 F.2d 476, 482 (9th Cir. 1973) (get-rich-quick marketing scheme). The same holds true even if not all aspects of a scheme constituted securities, and even where some aspects of a scheme may have been legitimate. *See, e.g., SEC v. Int'l Loan Network, Inc.*, 770 F. Supp. 678 (D.D.C. 1991) (finding that pyramid recruiting could be regulated as security even if other aspects of club memberships did not constitute securities), *aff'd*, 968 F.2d 1304 (D.C. Cir. 1992); *Koscot*, 497 F.2d at 475-76 (similar).

Defendants implicitly concede that the Retail Profit Pool and the Matrix meet the first two elements of the *Howey* test, requiring an investment of money in a common enterprise. Defendants' argument is that they did not expect profits based solely upon the efforts of others; rather, they worked hard for the money they received. Defendants have filed affidavits stating they worked many hours to: (1) drive new customers to the penny auction site, (2) promote the penny auction by placing daily advertisements on the internet, (3) network with other marketing professionals to gain greater exposure for Zeekler and ZeekRewards, (4) set up personal websites in an effort to drive traffic to Zeekler and ZeekRewards, (5) recruit customers to the penny auction and new members

to ZeekRewards, (6) participate in training programs and leadership calls; and (7) participate in mandatory compliance programs sponsored by ZeekRewards.

Courts have flexibly applied *Howey*'s "solely through the efforts of others" formulation. *See, e.g., Robinson v. Glynn*, 349 F.3d 166, 170 (4th Cir. 2003) (explaining that "the Supreme Court has endorsed relaxation of the requirement that an investor rely solely on others' efforts, by omitting the word 'solely' from its restatement of the *Howey* test") (citing *Int'l Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 561 (1979)); *Bailey v. J.W.K. Properties, Inc.*, 904 F.2d 918 (4th Cir. 1990) (observing that "[d]espite the restrictive language of the third prong of the test, later courts have explained that a program requiring some effort from the investor may still constitute an 'investment contract,' but the most essential functions or duties must be performed by others and not the investor"). To hold otherwise would make it too "easy to evade [the *Howey* test] by adding a requirement that the buyer contribute a modicum of effort." *Turner*, 474 F.2d at 482 (finding investment contract where investors were required to exert some effort to recruit new investors); *see also Koscot*, 497 F.2d at 480. Instead, courts have focused on whether promoters' efforts are "undeniably significant" or "essential managerial efforts" driving the enterprise's success or failure. *Turner*, 474 F.2d at 482.

The Court finds that the Defendants predominantly relied on the managerial "efforts of others" ―namely Burks and Rex Venture― to generate profits. Burks and Rex Venture contributed "significant" and "essential managerial efforts" to the enterprise. They created, updated, and operated the websites, handled all payments, managed the bank accounts and payment service providers, managed affiliate and customer accounts, managed all affiliate and customer services, oversaw and disbursed

6

all bids, operated the auctions, created all advertisements, sponsored recruiting videos and calls, and decided the daily payout percentages for the Retail Profit Pool. *See, e.g.*, Compl. at ¶¶ 7-9, 61, 106-09, and 112.

Investors, on the other hand, could participate in the Retail Profit Pool and the Matrix with minimal effort. For example, participating in the Retail Profit Pool required: (i) purchasing a monthly subscription; (ii) purchasing and giving away VIP Bids or selling Retail Bids; (iii) placing one free online advertisement daily; and (iv) enrolling penny auction customers, all of which could be accomplished via automated programs developed by Burks and Rex. The ZeekRewards website boasted that copying and pasting free ads created by Defendants should take no more than five minutes per day. Compl. at ¶¶21, 25-27. Placing more than one ad per day, or working to create improved ads, had no impact on the daily award percentage earned by a qualified affiliate. Compl. at ¶27.

Similarly, participating in the Matrix required: (i) purchasing a monthly subscription; and (ii) recruiting at least two investors to enroll in the monthly subscription plan, after which that investor was eligible to receive commissions on every additional paid subscriber within his or her "downline." Compl. at ¶¶37-38. This minimal effort does not change the fact that investors relied primarily on the efforts of Burks and Rex for the profits they sought to share. Indeed, courts have held that the "efforts of others" element of *Howey* is met where, as here, investors accrue profits primarily by recruiting new members. *See, e.g., Omnitrition Int'l, Inc. v. Adkins*, 79 F.3d 776, 784 (9th Cir. 1996) (finding that pyramid scheme satisfied the "efforts of others" element where investors accrued profits primarily by recruiting new members rather than by selling

products); *see also Turner*, 474 F.2d at 482 (similar); *Int'l Loan Network*, 968 F.2d at 1308 (similar). Defendants' emphasis upon the long hours they worked to recruit other others is misplaced. Without the essential managerial efforts of Burks and RVG, no profits would have been generated at all.

As the Court finds that it clearly has subject matter jurisdiction, it is unnecessary to address the Receiver's ancillary and supplemental jurisdiction argument or his argument that the Court also has diversity jurisdiction.

**B. Motions to Dismiss for Failure to State a Claim upon which Relief can be Granted**

Defendants also move under Rule 12(b)(6) to dismiss each of the Receiver's claims for failure to state a claim upon which relief can be granted. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 663 (2009). A complaint, therefore, must allege each necessary element of the claim. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 562 (2007). Moreover, the allegations must suffice to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The Court will address each of the Receiver's claims below.

### 1. Fraudulent Transfer of RVG funds:

In his First Claim for Relief, the Receiver seeks recovery of funds paid out to the Net Winners, alleging that these funds are the result of fraudulent transfers that are avoidable by the Receiver pursuant to N.C. Gen. Stat. §39-23.4(a)(1), N.C. Gen. Stat. §39-23.4(a)(2) or N.C. Gen. Stat. §39-23.5 and recoverable from the Defendants pursuant to N.C. Gen. Stat. §39-23.7 and N.C. Gen. Stat. §39-23.8.

8

Defendants argue that this claim must be dismissed because neither the Receiver nor RVG (in whose shoes he stands) is a "creditor" as defined in the North Carolina Uniform Fraudulent Transfer Act ("NCUFTA") and therefore he has no standing to pursue fraudulent transfer claims. Defendants' argument is without merit.

The NCUFTA defines "creditor" as a person who has a claim. N.C. Gen. Stat. §39-23.1(4). It is well-settled that a Receiver has standing to assert claims for fraudulent transfer under the UFTA because the Receivership entity was harmed by the diversion of those assets. *See Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995). In *Scholes*, the defendants, who included a net winner in a Ponzi scheme, argued that the receiver's fraudulent transfer claims belonged to the creditors rather than the receiver. The Seventh Circuit rejected this argument and found that because the corporate entities were harmed when assets were diverted through the fraudulent transfer, the receiver, as holder of claims belonging to the corporations, had standing to assert those claims. *Id.* at 754-55; *see also Janvey v. Democratic Senatorial Campaign Committee, Inc.*, 712 F.3d 185, 192 (5th Cir. 2013) (applying principles of *Scholes* and ruling that the receiver had standing to recover assets or funds that the principal fraudulently diverted to third-party political organizations without receiving reasonably equivalent value); *Donell v. Kowell*, 533 F.3d 762, 777 (9th Cir. 2008) (adopting *Scholes* and ruling that the receiver "has standing to bring this suit [to avoid transfers to defendants] because, although the losing investors will ultimately benefit from the asset recovery, the receiver is in fact suing to redress injuries that [the receivership entity] suffered when its managers caused [the entity] to commit waste and fraud"); *Wiand v. Lee*, 753 F.3d 1194, 1202 (11th Cir. 2014) (adopting

*Scholes* and ruling that the receiver has standing to sue on behalf of the corporations that were injured by the Ponzi scheme operator).

This Court has also adopted the reasoning of the *Scholes* court. *See Quilling v. Grand Street Trust*, 3:04-cv-251, 2005 WL 1983879, at *5 (W.D.N.C. Aug. 12, 2005); *see also Quilling v. Cristell*, 3:04-cv-252, 2006 WL 316981, at *5 (W.D.N.C. Feb. 9, 2006). In those cases, the court-appointed receiver brought a suit to recover funds fraudulently transferred to the defendants in connection with a Ponzi scheme. *Grand Street Trust*, 2005 WL 1983879, at *1; *Cristell*, 2006 WL 316981, at *1. This Court explicitly relied on the *Scholes* decision in finding that the receiver had standing to bring the fraudulent transfer claims against the defendants based on the loss of funds that caused harm to the receivership entity. *Grand Street Trust*, 2005 WL 1983879, at *5–6; *Cristell*, 2006 WL 316981, at *5–6.

The Defendants attempt to distinguish *Scholes* and criticize this Court's analysis in the *Quilling* cases, but make no attempt to address the other circuit court decisions cited above that have also adopted the reasoning in *Scholes*. Defendants' position is contrary to the weight of authority and the Court finds that the Receiver does have standing to assert a claim under the NCUFTA.

Defendants next argue that the Receiver has failed to plead the NCUFTA claim with the specificity required by Rule 9(b). Specifically, Defendants contend that the Complaint: (1) fails to make a single factual allegation against any of the named Defendants (other than alleging their places of residence and that they were Net Winner Affiliates); (2) constitutes a bare recital of the statutory elements of fraudulent transfer;

and (3) fails to identify the dates or amounts of any fraudulent transfers allegedly made by any of the named Defendants.

In support of their argument, Defendants cite two unpublished cases, one from the Eastern District of North Carolina, and one from the Bankruptcy Court for the Middle District of North Carolina. Neither case contains an articulation of the court's reasoning for applying Rule 9(b) to a NCUFTA claim. Courts that have closely analyzed the issue have found that fraudulent transfer claims pursuant to the UFTA are subject to Rule 8's pleading standard. As these courts explain, a claim for fraudulent transfer involves no allegations of fraud on the part of the defendant transferee, but only by the non-party transferor (the Insiders here). Consequently, where a complaint does not allege that the defendants themselves committed fraudulent acts, Rule 8 applies. *See Janvey v. Alguire*, 846 F. Supp. 2d 662, 676 (N.D. Tex. 2011) ("The Court can find no principled reason for applying Rule 9's pleading requirements to . . . the Receiver's fraudulent transfer claims . . . .") (citation omitted); *GE Capital Commercial, Inc. v. Wright & Wright, Inc.*, 2009 WL 5173954, at *10 (N.D. Tex. 2009) ("[Plaintiffs have] not alleged *fraud* against . . . Moving Defendants, which is the contemplation of Rule 9(b). Plaintiffs have merely alleged that Moving Defendants were the recipient of funds fraudulently obtained. Nothing in the complaint or record indicates that Moving Defendants committed any fraudulent act that caused the funds to be transferred.") (emphasis in original); *Nesco, Inc. v. Cisco*, 2005 WL 2493353, at *3 (S.D. Ga. 2005) ("Neither the intent of the debtor nor the knowledge of the transferee is required to be proven in order to establish a fraudulent conveyance under Georgia's UFTA. As a result, the considerations that lead to the pleading requirements under Rule 9(b) in cases of common law fraud are not present

11

in an action for fraudulent conveyance."). Based upon the persuasive reasoning of these courts, the Court finds that Rule 8 governs the fraudulent transfer claim.[2]

Defendants contend that even if the Court applies the pleading requirements of Rule 8, the Complaint nevertheless fails because the Receiver makes only threadbare recitals of the elements of a NCUFTA claim supported by mere conclusory statements. The Court has reviewed the Complaint, which sets forth in great detail the existence of the RVG Ponzi scheme, the manner in which it operated, the amount of funds transferred to the named Defendants, and the general timeframe of the transfers. Defendants would have the Receiver allege the specific dates and amounts of each of the 690+ transfers from RVG during the life of ZeekRewards. The Court finds such specificity to be unnecessary and unwarranted.

Taking all the Complaint's allegations as true and drawing all reasonable inferences in Plaintiff's favor, the Court finds that the Complaint states a plausible claim for relief for violation of the NCUFTA. Accordingly, Defendants' Motion to Dismiss this claim is denied.

### 2. Common Law Fraudulent Transfer

The Second Claim for Relief is for common law fraudulent transfer. Defendants assert that this claim must be dismissed because the claim does not exist in North Carolina. Fraudulent conveyance claims in North Carolina are governed by statute, not

---

[2] Even if the Court were to review the claim under Rule 9(b), the Complaint contains sufficient particularity to survive Defendants' Motion to Dismiss. The Fourth Circuit has instructed that courts "should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which [the defendant] will have to prepare a defense at trial, and (2) that plaintiff has substantial pre-discovery evidence of those facts." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999). Those two factors are certainly present here.

common law. In support of their argument, Defendants cite a case from the Arizona Court of Appeals, *Moore v. Browning*, 203 Ariz. 102, 50 P.3d 852 (Ct. App. 2002).

The Receiver contends that his common law fraudulent transfer claim is asserted in the alternative. To the extent that the Receiver cannot assert claims under the NCUFTA, he argues that he is entitled under common law to recover the fraudulent transfers made by RVG to the Defendants. *See In re Valente*, 360 F.3d 256 (1st Cir. 2004) (collecting cases and concluding that the adoption of the UFTA by a state does not preempt common law remedies relating to fraudulent transfers). The Court agrees. Defendants' Motion to Dismiss this claim is likewise denied.

### 3. Constructive Trust

Finally, the Defendants move to dismiss the Receiver's claim for constructive trust, arguing that "constructive trust" is an equitable remedy, not a cause of action. Moreover, Defendants argue that North Carolina case law is clear that a constructive trust is an equitable remedy that is only available if there is no adequate legal remedy.

North Carolina law holds that a constructive trust may be requested as a claim or in the prayer for relief. *See, e.g., Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 723 S.E.2d 744 (N.C. 2012) (reversing denial of constructive trust for further fact-finding where constructive trust was alleged as an affirmative claim for relief); *see also Cury v. Mitchell*, 688 S.E.2d 825, 828 (N.C. Ct. App. 2010) ("These allegations and the facts as presented in the complaint are sufficient to state a claim for constructive trust, and the trial court erred by granting defendant's motion to dismiss for failure to state a claim."). The Court finds that the Receiver has properly requested a constructive trust, regardless of whether it is technically considered a claim or a remedy.

13

Defendants further contend that the Complaint fails to allege any wrongdoing by any of the named Defendants sufficient to give rise to the imposition of a constructive trust. "A constructive trust . . . is a trust by operation of law which arises contrary to intention . . . against one who . . . in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy." *Roper v. Edwards*, 373 S.E.2d 423, 425 (N.C. 1988) (quoting *Electric Co. v. Construction Co.,* 148 S.E.2d 856, 860 (N.C. 1966)). In *Roper*, the defendants argued "that the absence of fraud defeats a request for constructive trust." *Id*. The North Carolina Supreme Court disagreed:

> We disagree. A constructive trust is imposed "to prevent the unjust enrichment of the holder of title to, or of an interest in, property which such holder acquired through fraud, breach of duty *or some other circumstance making it inequitable for him to retain it against the claim of the beneficiary of the constructive trust*." *Wilson v. Development Co.*, 276 N.C. at 211, 171 S.E.2d at 882 (emphasis added). "Inequitable conduct short of actual fraud will give rise to a constructive trust where retention of the property by the holder of the legal title would result in his unjust enrichment." 4A R. Powell, *Powell on Real Property* § 596[1], at 48-23 (1986). Fraud need not be shown if legal title has been obtained in violation of some duty owed to the one equitably entitled. *Electric Co. v. Construction Co.*, 267 N.C. 714, 719, 148 S.E.2d 856, 860 (1966).

*Roper*, 373 S.E.2d at 425 (emphasis added) (internal quotation marks omitted).

Defendants' argument that they should not be subjected to the imposition of a constructive trust because their own fraud is not the subject of the complaint fails. The Complaint sets forth allegations sufficient to show that "some other circumstance" makes it inequitable for these Defendants to retain the funds they received. *See id.* This "other circumstance" is that Defendants received the funds from an admitted Ponzi and pyramid

scheme,[3] and that the funds are nothing more than other people's money wrongfully diverted from RVG. Therefore, Defendants have received property which they "ought not, in equity and good conscience, hold and enjoy." *Id.*

Lastly, Defendants argue that a constructive trust is an equitable remedy that is only available if there is no adequate legal remedy. *In re Gertzman*, 446 S.E.2d 130, 135 (N.C. App. 1994) ("A constructive trust does not arise where there is no fiduciary relationship and there is an adequate remedy at law."), citing *Security National Bank of Greensboro v. Educators Mutual Life Ins. Co.*, 143 S.E.2d 270, 276 (N.C. 1965). Defendants contend that the Receiver's allegation that he has "no adequate remedy at law" (Comp., ¶ 175) is a naked legal conclusion, and must be supported by factual allegations to be viable.

Contrary to Defendants' argument, a review of the Complaint reveals that the Receiver has alleged sufficient facts which, viewed in the light most favorable to the Receiver, demonstrate that there is no adequate remedy at law. Defendants, as some of the top-dollar ZeekRewards net winners, were early adopters of the ZeekRewards scheme. As a result, these named Defendants may have already dissipated much of their net winnings, which without a constructive trust would be impossible for the Receiver to trace and secure. The Receivership will likely never be able to pay victims of the ZeekRewards scheme the full amount of their losses. Without a constructive trust and the ability to trace fraudulently transferred Receivership Assets, the Receiver's remedy at law is inadequate. Therefore, the Complaint contains sufficient allegations to warrant the imposition of a constructive trust against the Defendants.

---

[3] To be clear, the Defendants themselves have not admitted that ZeekRewards was a Ponzi or pyramid scheme. However, the principal, Paul Burks, and certain insiders have made such an admission and have agreed to plead guilty to securities fraud.

IT IS THEREFORE ORDERED that Defendants' Motion to Dismiss is hereby DENIED.

Signed: December 8,

Graham C. Mullen
United States District Judge